UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
IN RE: RHODIA S.A. SECURITIES
LITIGATION

-----------------------------------X

This Document Relates To:
All Securities Actions

-----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/24/07

MDL No. 1714

Civil Action No.:
1:05 Civ. 5389 (DAB)
MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiffs are a putative class of investors who held securities of Defendant Rhodia, S.A. ("Rhodia") between April 26, 2001 and March 23, 2004. The lead Plaintiffs are foreign corporations. They allege that Rhodia and the other Defendants fraudulently inflated Rhodia's worth to the investing public. Plaintiffs have brought their claims pursuant to Section 10(b) of the Securities and Exchange Act ("Section 10(b)") and Rule 10b-5 promulgated thereunder, as well as pursuant to Section 20(a) of the Securities and Exchange Act ("Section 20(a)"). Now before this Court is a Motion to Dismiss pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure. The Motion has been brought by Jean-Pierre Tirouflet, Pierre Prot, Gilles Auffret, Jean-Claude Clamadieu, and Rhodia.[1]

_____

[1] On September 29, 2006, Lead Plaintiffs' Counsel filed a Notice of Additional Parties which added Sanofi-Aventis, S.A. as a Defendant in this suit. That Notice required no action from the Court.

For the reasons contained herein, Moving Defendants' Motion shall be GRANTED.   Lead Plaintiffs shall be granted leave to amend the Complaint in accordance with this Memorandum & Order.

## I. BACKGROUND

### A.   The Parties

The allegations in the Complaint are assumed to be true for purposes of this Motion.

The putative class is defined in the Complaint as "purchasers of the publicly traded securities of Rhodia, including ordinary shares and American Depositary Shares ("ADSs") between April 26, 2001 and March 23, 2004, inclusive".   (Compl. ¶ 1.)   Lead Plaintiffs Oppenheim Primerica Asset Management S.A.R.L. and Activest Investmentgesellschaft mbH ("Lead Plaintiffs") allege they purchased ADSs during the Putative Class Period.

Defendant Rhodia manufactures "specialty chemicals" for the consumer care, food, industrial care, pharmaceuticals agrochemicals, automotive, and electronics industries.   (Compl. ¶ 2.)   It is a public company which is incorporated in France and

---

On the same day that the Notice of Additional Parties was filed, Lead Plaintiffs filed an Amended Complaint.   Defendant Sanofi-Aventis, S.A. has neither been served with, nor responded to, that Amended Complaint.

2

which maintains its principal place of business in France.
(Compl. ¶ 21.)  Rhodia's ordinary shares are traded in France on
the Paris Bourse, and its ADSs are traded on the New York Stock
Exchange.  (Compl. ¶ 21.)  Less than two percent of Rhodia's
outstanding common shares of stock were ADSs traded on the New
York Stock Exchange during the Putative Class Period.  (Defs.'
Mem. of Law at 6.)  Rhodia is formerly a wholly owned subsidiary
of Rhône-Poulenc.  (Compl. ¶ 21.)

     Defendant Sanofi-Aventis, S.A. is the indirect successor
corporation to Rhône-Poulenc, which was the French corporation
formed as a result of the December 1999 merger of the French
corporation Rhône-Poulenc and the German corporation Hoechst A.G.
(Compl. ¶ 22.)

     Defendant Jean-Pierre Tirouflet was Chairman and CEO of
Rhodia from 1998 until October of 2003.  (Compl. ¶ 23.)
Defendant Pierre Prot became CFO and Senior Vice President of
Rhodia on January 1, 1998 and remained in that position through
the Putative Class Period.  (Compl. ¶ 24.)  Defendant Gilles
Auffret was Rhodia's President and COO from 2001 to 2003, its
Designated Executive Officer from October of 2003 to June of
2005, and is now serving as Chief Executive Vice President of
Operations.  (Compl. ¶ 25.)  Defendant Jean-Pierre Clamadieu was

President of Rhodia from April of 2003 to October of 2003, until
he followed Tirouflet as Rhodia's CEO on October 2003. (Compl. ¶
26.)

## B. Alleged Transfer of Liabilities to Rhodia

In January of 1998, Rhône-Poulenc formed Rhodia as its
wholly owned subsidiary. (Compl. ¶ 39.) Rhodia was established
to help Rhône-Poulenc divest itself of some of its chemicals,
polymers, and fibers operations. (Compl. ¶ 39.) Rhône-Poulenc
allegedly transferred to Rhodia "tens, if not hundreds, of
chemical plant sites world-wide". (Compl. ¶ 40.) While more
than one of the transferred plant sites may have been in North
America (see Compl. ¶ 127 ("[s]ome of Rhodia's North American
subsidiaries have potential liabilities under . . . federal or
state environmental regulation")), Lead Plaintiffs set forth
specific allegations only as to one such plant site in the United
States – the Silver Bow Site in Montana. (Compl. ¶¶ 189, 206.)

According to the Complaint, Rhodia also assumed the
environmental liabilities of these plant sites. (Compl. ¶ 41.)
Many of the plant sites allegedly had serious environmental
problems. As a result of the problems at Silver Bow, Rhodia
incurred $16.2 million in criminal fines and $1.8 million in
restitution penalties. (Compl. ¶ 189; Pls.' Opp. Mem. of Law at

4

12.)  Rhône-Poulenc agreed to indemnify Rhodia up to €122 million for compliance, fines, and other obligations related to the "tens, if not hundreds" of plant sites transferred to Rhodia, but Lead Plaintiffs allege that this amount was nowhere near adequate to cover the liabilities Rhodia incurred.  (Compl. ¶ 41.) According to the Complaint, Rhodia ultimately incurred "hundreds of millions of dollars of environmental liabilities", all of which remained undisclosed to the investing public.  (Compl. ¶ 83.)

Upon Rhodia's formation, Rhône-Poulenc also allegedly transferred to Rhodia pension fund liabilities and other employment retirement fund commitments in excess of €500 million. (Compl. ¶ 42.)  Lead Plaintiffs assert that Rhodia assumed these liabilities without sufficient consideration.  (Compl. ¶ 42.) Lead Plaintiffs also contend that Rhodia's assumption of these obligations was not disclosed to the investing public.  (Compl. ¶ 45.)

In June of 1998, Rhône-Poulenc posted an Initial Public Offering for 33% of Rhodia's outstanding shares.  (Compl. ¶ 43.) The ordinary shares, which traded on the Paris Bourse, and the ADSs, which traded on the New York Stock Exchange, were priced at

€25.921.[2] (Compl. ¶ 43.)  Rhône-Poulenc, however, continued to
own 67% of the remaining shares, and thus retained control over
Rhodia.  (Compl. ¶ 43.)

## C.    Rhodia's Acquisition of Other Entities

The Complaint alleges that in December of 1998, Rhône-
Poulenc and Hoechst, a German life-sciences company, announced
their intention to merge.  (Compl. ¶ 44.)  According to Lead
Plaintiffs, Rhône-Poulenc and Hoechst agreed to divest themselves
of their non-life sciences assets prior to the merger, including
Rhodia.  (Compl. ¶ 45.)  However, since Rhône-Poulenc's June 1998
posting of Rhodia's IPO, the price of Rhodia's publicly traded
shares had steadily declined to approximately €11/share as a
result of circumstances "unrelated" to the alleged misconduct in
the Complaint.  (Compl. ¶ 47.)  Therefore, Lead Plaintiffs argue,
Rhône-Poulenc's ability to sell off its remaining shares of
Rhodia at lucrative rates was threatened.  (Compl. ¶ 45.)
Because the proposed merger agreement hinged on Rhône-Poulenc's
ability to maintain value parity with Hoechst, the decline of
Rhodia's shares – and consequently the decreased price at which
Rhône-Poulenc could liquidate certain of its assets (i.e.,

_____

[2] The Complaint did not allege the amount in American
dollars at which the ADSs on the New York Stock Exchange traded
during this time.

6

Rhodia) – jeopardized Rhône-Poulenc's ability to effectuate its merger with Hoechst.  (Compl. ¶ 47.)

This threat, according to Lead Plaintiffs, motivated Rhône-Poulenc to implement steps to inflate artificially the price of Rhodia shares.  (Compl. ¶ 48.)  To this effect, Rhône-Poulenc sought to acquire for Rhodia a British manufacturer of phosphates and chemicals known as Albright & Wilson PLC ("A&W").  (Compl. ¶ 48.)  The A&W acquisition was intended to generate media attention, thereby propelling the price of Rhodia's shares upward.  (Compl. ¶ 48.)  Rhodia's acquisition of A&W, however, was contrary to Rhône-Poulenc's agreement with Hoechst to divest itself of all non-life science business.  (Compl. ¶ 49.)  As well, A&W's financial health was not in good condition.  (See, e.g., ¶¶ 71-76.)  Therefore, the Complaint states, "the defendants had to devise a plan in which Rhodia would acquire A&W, increasing Rhodia's share price, while at the same time ensuring that the acquisition would not appear as an acquisition by Rhône-Poulenc and potentially compromise the merger with Hoechst".  (Compl. ¶ 49.)

To achieve those ends, Rhône-Poulenc and Rhodia allegedly used Donauchem GmbH ("Donau") as an off-balance sheet entity through which Rhodia would acquire A&W.  (Compl. ¶¶ 50-52.)  Donau, a privately-held Austrian corporation, had recently split

from Rhône-Poulenc through a management buy-out.  A former
executive officer of Rhône-Poulenc and alleged personal friend of
Tirouflet, Alain de Krassny, helmed Donau, and was alleged to
have received in the range of "60 million [sic]" for agreeing to
assist Rhodia's acquisition of A&W.  (Compl. ¶ 53.)

To effectuate the acquisition, Tirouflet negotiated on
Rhodia's behalf an agreement – the "Heads of Agreement" – with
Donau.  (Compl. ¶ 55.)  Under the Heads of Agreement, Donau
agreed to form a wholly owned subsidiary, Danube Chemicals
Acquisition Corp. ("Danube Chemicals"), a Delaware corporation.
(Compl. ¶ 56.)  Danube Chemicals, in turn, would form a wholly-
owned British subsidiary, ISPG plc ("ISPG").  (Compl. ¶ 56.)
ISPG's alleged purpose of incorporation was to make a cash tender
offer for all outstanding shares of A&W.  (Compl. ¶ 56.)
According to Lead Plaintiffs, the Heads of Agreement further
provided that Rhodia would furnish Danube Chemicals with 98% of
its initial capital.  (Compl. ¶¶ 57-58.)  As consideration for
Rhodia's capitalization of Danube Chemicals, Donau allegedly
issued to Rhodia a call option which could be exercised between
January 1, 2000 and April 1, 2000 at a fixed price of £15.9
million ("Rhodia Call Option").  (Compl. ¶¶ 59-60.)  The call
option permitted Rhodia to direct Donau to transfer all of Danube
Chemicals' outstanding shares to Rhodia, making Danube Chemical a

8

wholly owned subsidiary of Rhodia.  (Compl. ¶ 59.)  Because the
exercise price was fixed, Lead Plaintiffs contend, Rhodia bore
the risk that the value of Danube Chemical's assets, i.e., A&W,
could decrease.  (Compl. ¶ 60.)  If Rhodia did not exercise the
call option, however, Danube Chemicals would have the right to
purchase all of Rhodia's phosphate business at fair market value.
(Compl. ¶ 61.)  But because Danube Chemical allegedly was a shell
corporation almost entirely capitalized by Rhodia, Danube
Chemicals' right of purchase, the Complaint states, is not fairly
characterized as a right.  Indeed, were Danube Chemicals to
exercise the right of purchase, Rhodia promised that it would
finance the phosphate business for two years following the date
of purchase.  (Compl. ¶ 61.)  According to Lead Plaintiffs, the
effect of the Heads of Agreement was that Rhodia would
"contribute[] 98% of the capital to acquire A&W to a company that
would be unable to repay that debt, so the Rhodia Call Option was
not really an 'option', but an obligation to purchase."  (Compl.
¶ 62.)

On March 16, 1999, Rhodia announced its intention in a press
release to support ISPG's bid for A&W.  (Compl. ¶ 64.)  The press
release touted the benefits that the A&W acquisition would have
for Rhodia: "[I]f Rhodia were to exercise its option to acquire
Albright & Wilson's assets, it would become the world's leading

9

producer of specialty phosphates." (Compl. ¶ 65.)   Lead
Plaintiffs allege that this press release was one of the first
among many promulgated statements which promoted A&W positively,
even though Rhodia and Rhône-Poulenc knew that the Rhodia Call
Option significantly over-valued A&W.   (Compl. ¶ 65.)

On March 30, 1999, Tirouflet, acting on behalf of Rhodia,
and Donau amended the Heads of Agreement.   (Compl. ¶ 66.)   That
amendment, according to Lead Plaintiffs, gave "the appearance of
converting the Rhodia Call Option from a fixed-price option to a
variable-priced fair value option", thereby ostensibly shifting
the risk of loss from Rhodia to Donau.   (Compl. ¶ 66.)   Lead
Plaintiffs allege that later that same day, Rhodia and Donau
covertly executed a second amendment to the Heads of Agreement,
which re-defined "fair market value" as the fixed price equal to
£15.9 million plus any dividends paid by ISPG, thereby shifting
the risk of A&W's value back to Rhodia.   (Compl. ¶ 67.)   This
second amendment, Lead Plaintiffs allege, was never disclosed to
the public.   (Compl. ¶ 67.)   The Complaint does not allege
whether Tirouflet was involved in the negotiations of this second
amendment.   (See Compl. ¶ 67.)

On May 12, 1999, ISPG paid £526 million for A&W.   (Compl. ¶
68.)   On May 17, 1999, Rhodia announced the tender offer, and as
a result, Rhodia's shares started to trade in Paris at €18.00 per

10

share.   (Compl. ¶¶ 68, 69.)  According to Lead Plaintiffs, however, Rhodia and Rhône-Poulenc were not disclosing to Rhodia's shareholders A&W's significant financial impairments, including a £94 million pension deficit (Compl. ¶¶ 71, 75, 77) and a precipitous decline in general performance (Compl. ¶ 81). Indeed, such liabilities allegedly could not have been known by prospective Rhodia shareholders because A&W was taken off the London Stock Exchange once ISPG acquired it.   (Compl. ¶ 68.)

On October 15, 1999, Rhône-Poulenc conducted a Second Offering of Rhodia.  Rhône-Poulenc sold 39.1% of its remaining 66% ownership of Rhodia, and pledged its remaining 25.9% as collateral for convertible debentures it allegedly raised through a private placement conducted that same day.  (Compl. ¶ 78.)  As a result, Rhône-Poulenc earned approximately €2 billion.  (Compl. ¶ 78.)

On October 26, 1999, Rhône-Poulenc, having sold its majority ownership of Rhodia at a price which maintained value parity with Hoechst, executed the merger with Hoechst.  (Compl. ¶ 79.)  The Rhodia Call Option was exercised fewer than five months later on March 15, 2000, making A&W a wholly owned subsidiary of Rhodia. (Compl. ¶ 79.)  In essence, Lead Plaintiffs are alleging that once Rhône-Poulenc used the press coverage of the A&W acquisition and Rhodia Call Option to inflate the prices of Rhodia's shares,

11

Rhodia had served its undisclosed purpose of helping Rhône-
Poulenc achieve value parity with Hoechst.

On July 24, 2000, Rhodia acquired another corporation,
ChiRex.  (Compl. ¶ 84.)  ChiRex was an American corporation.
(Compl. ¶ 84.)  The acquisition cost $545 million, a price which
Lead Plaintiffs allege significantly over-valued ChiRex.  (Compl.
¶ 85.)

## D.   The Allegedly Fraudulent Statements to Rhodia Shareholders and the Investing Public

The Putative Class Period began on April 26, 2001.  (Compl.
¶ 1.)  Lead Plaintiffs allege that at the inception of the Class
Period, shares of Rhodia stock were trading on the Paris Bourse
at €14.00 and ADSs of Rhodia were trading on the New York Stock
Exchange at $12.55.  (Compl. ¶ 9.)  Over the course of the next
three years - from April 26, 2001 to March 23, 2004 (the last day
of the Putative Class Period) - Rhodia and Rhône-Poulenc issued a
series of overly optimistic press releases, investor guidance,
quarterly SEC filings, and annual reports, which glossed over
Rhodia's slowly deteriorating performance.  (Compl. ¶¶ 88-181.)
Some of the press releases were picked up by American press
venues like Bloomberg (see, e.g., Compl. ¶¶ 89, 102, 103, 138);
some of Defendants' statements and SEC filings were incorporated
into guidance given at Goldman Sachs conferences in West Palm

12

Beach, Florida (see, e.g., Compl. ¶ 90).  Lead Plaintiffs do not allege that any of these statements or filings were created or planned in the United States.  (Compl. ¶¶ 88-181.)

While the value of Rhodia's shares declined during the first year-and-a-half that Rhodia issued these statements and filings, Lead Plaintiffs do not allege that these early declines resulted from Rhodia's assumption of Rhône-Poulenc's liabilities or from Rhodia's acquisitions of A&W and ChiRex.  Rather, they allege that Defendants' statements and filings had the effect of continuously "inflating" the value of Rhodia's shares.  (See, e.g., Compl. ¶ 142.)  Specifically, Lead Plaintiffs contend that the documents did not disclose Defendants' purported purpose for acquiring A&W and Chirex and for transferring Rhône-Poulenc's liabilities to Rhodia.  Lead Plaintiffs allege that while Defendants included Rhodia's disappointing results in its statements and filings, they would buffer those statements and filings with allegedly false assertions about Rhodia's plans to "react vigorously" (Compl. ¶ 101), "dispose of non-core business" (Compl. ¶ 101), and "speed up the pace of [Rhodia's] restructuring plan" (Compl. ¶ 113).  Moreover, Defendants allegedly faulted, among other things, the "higher fuel prices" (Compl. ¶ 129(b)) and the "obviously difficult economic environment" (Compl. ¶ 113; see also Compl. ¶ 120) for Rhodia's

13

slowly deteriorating performance during the first year-and-a-half
of the Putative Class Period.

As a result of Defendants' allegedly fraudulent statements
during this period, Lead Plaintiffs alleged the following: "[A]t
the time" Rhodia filed its July 30, 2001 Form 6-K, Rhodia's
shares were trading at €12.00 in Paris and its ADSs were trading
at $10.00 in New York (Compl. ¶ 105); "following publication of
guidance" on October 25, 2001, Rhodia shares traded at €9.50 in
Paris while its ADSs traded at $8.50 in New York (Compl. ¶¶ 113,
116); after a release of 2001 annual data on January 29, 2002,
shares traded at €10.00 in Paris and its ADSs traded at $9.00 in
New York (Compl. ¶ 123); and following a second quarter report
shares traded at €7.75 in Paris and ADSs traded at $8.00 in New
York (Compl. ¶ 129).  In mid-December of 2002, Moody's downgraded
Rhodia's unsecured debt ratings, but Rhodia followed the
downgrade with a press release stating that Moody's actions
simply reinforced the need for Rhodia to intensify efforts it
already was taking to "restructure its portfolio and improve its
financial structure".  (Compl. ¶ 141.)  According to Lead
Plaintiffs, the optimism in Defendants' press release had the
"continued effect of inflating shares of Rhodia", so that its
shares traded at €8.00 in Paris, and its ADSs traded at $8.00 in

14

New York.  (Compl. ¶ 142.)[3]

But as Rhodia's SEC filings and press releases reported escalating financial losses over the remainder of the second year-and-a-half of the Putative Class Period, Lead Plaintiffs allege that Defendants' sanguine predictions and stated plans for Rhodia's future were less and less persuasive to the investing public.  On October 30, 2003, for example, Rhodia issued a release announcing results for the third quarter of 2003 which reported, among other things, lower net sales and a lower EBITDA[4]/sales ratio.  (Compl. ¶ 172.)  "At the time of the earnings release", shares of Rhodia "traded down to approximately €4.47 per share in Paris, and to about $5.25 per ADS in New York."  Lead Plaintiffs go on to describe the continuing trend:

> In the months following [Rhodia's] announcement, however, shares of Rhodia continued to trade higher, reaching almost €5.00 and $5.75 by early-November.  Thereafter, shares of Rhodia came under more pressure as reports surfaced that [Rhodia] creditors and certain debt holders might push for early repayment of certain notes as a result of covenant violations.  By December 23, 2003, Rhodia ADSs traded to a low of $3.61 on the NYSE and €2.91 on the Paris Bourse.

(Compl. ¶ 174.)

---

[3] The Court assumes familiarity with the fifty pages in the Complaint in which Lead Plaintiffs outline and excerpt these various SEC filings.

[4] EBITDA stands for "Earnings Before Interest, Tax, Depreciation and Amoritzation".  (Compl. ¶ 88.)

During the second week of February 2004, Rhodia ADSs allegedly traded over $5.00 in New York and over €3.90 in Paris (Compl. ¶ 179.)   On February 13, 2004, Rhodia filed its year-end results for 2003 which reported losses and referred to 2003 as a "year marked by a combination of negative factors strongly impacting Group operating performance", but also stated a belief that "Rhodia would foreseeably achieve positive net income and report sustained profitability by 2006".  (Compl. ¶ 179.) "[F]ollowing the publication of this report", Rhodia ADSs "continued to trade well above $4.00 on the NYSE and €3.00 on the Paris Bourse".  (Compl. ¶ 180.)  By March 10, 2004, shares traded at €2.85 in Paris and ADSs traded to $3.51 in New York.  (Compl. ¶ 180.)

Lead Plaintiffs also allege that the data reported in many of Defendants' filings and statements either was inaccurate or was not calculated using reasonable accounting principles. (See, e.g., Compl. ¶ 158(c).)  These alleged inaccuracies, among other things, ignored the extent of Rhodia's environmental liabilities (see, e.g., Compl. ¶¶ 126-127, 156), hid Rhodia's intent not to reduce its debt (see, e.g., Compl. ¶ 141), misrepresented Rhodia's goodwill (see, e.g., Compl. ¶¶ 154, 169), and misstated the amount of Rhodia's deferred tax assets (see, e.g., Compl. ¶ 155).

16

On March 23, 2004 – the last day of the Putative Class Period – Defendants filed a Form 20-F with the SEC, which disclosed that Rhodia was subject to a criminal investigation by France's Autorite des Marches Financiers.  The investigation pertained to, among other things, Rhodia's acquisition of A&W. (Compl. ¶ 182.)  The Form 20-F also included a statement that Rhodia's failure to generate positive cash flow raised "substantial doubt on Rhodia's ability to continue as a going concern".  (Compl. ¶ 185.)  The Form 20-F further stated that Rhodia did "not expect to generate positive net cash from operating activities . . . to meet [its] liquidity needs . . . or debt service obligations", and referred in significant detail to Rhodia's "deteriorated financial situation".   (Compl. ¶ 186.)

According to the Complaint, Defendants' 20-F disclosure about Rhodia's actions amounted to a disclosure that Rhodia had been mis-characterizing its own fiscal health for years. Accordingly, Lead Plaintiffs argue, the price of Rhodia shares declined again.  (Compl. ¶¶ 187, 188, 190, 211-219.)  Between March 23, 2004 and March 24, 2004, the value of Rhodia ADSs in New York fell from $2.95 to $2.70, and the value of its shares in Paris fell from €2.36 to €2.17, "a one-day decline of almost 8% on unusually heavy trading volume".  (Compl. ¶ 187.)  By April 6, 2004 – after the close of the Putative Class Period – shares were

17

trading at €2.09 in Paris and ADSs traded at $2.50 in New York. (Compl. ¶ 188.)

Rhodia submitted a press release on March 28, 2005 and a Form 6-K on March 30, 2005, which disclosed the contents of a letter by the Autorite des Marches Financiers. (Compl. ¶ 194.) That letter detailed the findings by the French investigating authority that Rhodia had improperly valued ChiRex, misrepresented deferred tax assets, and issued "inaccurate, imprecise and misleading" press releases and financial disclosures to the public. (Compl. ¶¶ 195-205.)

Lead Plaintiffs have brought this putative class action suit to recover losses they incurred as a result of Defendants' allegedly fraudulent statements. Defendants Rhodia, Tirouflet, Prot, Auffret and Clamadieu ("Moving Defendants") have moved to dismiss the claims brought by putative class members who are foreign traders of Rhodia's shares on the Paris Bourse for lack of subject matter jurisdiction. As well, Moving Defendants' have moved to dismiss the Section 10(b) claims of all traders for failure both to plead loss causation and to plead scienter with particularity. Individual Defendants have moved to dismiss the Section 20(a) claim against them for failure to make out a predicate Section 10(b) claim and for failure to allege that any of them acted as culpable participants in the alleged fraud.

18

Finally, Defendants Auffret and Clamadieu move to dismiss both claims against them in their entirety for lack of personal jurisdiction.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

While a Court considering a challenge to subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure must "accept as true all material factual allegations in the complaint," Shipping Financial Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998), "the burden of proving jurisdiction is on the party asserting it . . . to make a prima facie showing of jurisdiction." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (citing CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986)). Moreover, "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Financial, 140 F.3d at 131; see also Robinson, 21 F.3d at 507 ("In determining whether a plaintiff has met this burden, we will not draw argumentative inferences in the plaintiff's favor."); London v. Polishook, 189 F.3d 196, 199 (2d Cir. 1999) ("[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction . . . to proffer the necessary factual predicate –

19

not just an allegation in a complaint – to support

jurisdiction.") (citations omitted).  Therefore, when resolving

issues surrounding its subject matter jurisdiction, a district

court is not confined to the Complaint and may refer to evidence

outside the pleadings, such as affidavits.  Makarova v. United

States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v.

American Telephone & Telegraph Co., 791 F.2d 1006, 1011 (2d Cir.

1986)).

Defendants in this case concede this Court's subject matter

jurisdiction over: "transaction in Rhodia's common stock by U.S.

residents or transactions in Rhodia's ADRs [sic] on the U.S.

securities markets."  (Def. Mem. of Law at 12, n.1.)  Indeed, it

is axiomatic that "subject matter jurisdiction remains 'an

unwaivable sine qua non for the exercise of federal judicial

power.'"  Herrick Co., Inc. v. SCS Communications, Inc., 251 F.3d

315, 321 (quoting Curley v. Brignoli, Curley & Roberts Assocs.,

915 F.2d 81, 83 (2d Cir.1990).  Rule 12(h)(3) of the Federal

Rules of Civil Procedure states "[w]henever it appears by

suggestion of the parties or otherwise that the court lacks

jurisdiction of the subject matter, the court shall dismiss the

case."  Therefore, this Court independently considers the

jurisdictional question and finds subject matter jurisdiction

over transactions in Rhodia's common stock traded by U.S.

residents and transactions in Rhodia's ADSs on the U.S.
securities markets.  <u>See</u> <u>Schoenbaum v. Firstbrook</u>, 405 F.2d at
208 (2d Cir. 1968), <u>rev'd with respect to holding on merits</u>, 405
F.2d 215 (2d Cir. 1968) (<u>en banc</u>), <u>cert. denied</u> <u>sub nom.</u> <u>Manley</u>
<u>v. Schoenbaum</u>, 395 U.S. 906 (1969) (finding that district courts
have "subject matter jurisdiction over violations of the
Securities Exchange Act although the transactions which are
alleged to violate the Act take place outside the United States,
at least when the transactions involve stock registered and
listed on a national securities exchange, and are detrimental to
the interests of American investors.").  As a result, the inquiry
is confined to whether subject matter jurisdiction exists over
the claims of foreign purchasers of Rhodia stock on foreign
exchanges, such as the Paris Bourse ("Foreign Plaintiffs").[5]

Because Sections 10(b) and 20(a) are silent about their
extraterritorial reach, whether such jurisdiction exists depends
on Congress' intent to devote 'the precious resources of United

---

[5] Of course, as already noted, the Court will retain
jurisdiction over some non-U.S. residents if they purchased ADSs
on the U.S. securities markets.  But for ease of identification
the claims of foreign plaintiffs on foreign exchanges will be
referred to as "Foreign Plaintiffs."  "Remaining Plaintiffs,"
also used herein, shall refer both to: 1) all investors in the
Putative Class who, during the Putative Class Period, resided
legally in the United States and traded shares of Rhodia on the
Paris Bourse, and 2) all investors in the Putative Class who
traded ADSs of Rhodia on the New York Stock Exchange during the
Putative Class Period.

States courts' to a specific transnational securities fraud claim.  Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 121 (2d Cir. 1995).  To provide district courts with guidance in such determinations, the Circuit has set forth two jurisdictional tests.  Itoba, at 121-22.

The first test is the "effects" test announced in Schoenbaum v. Firstbrook, 405 F.2d at 206-09.  "[T]he effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges."  Europe & Overseas Comm. Traders, S.A. v. Banque Paribus, 147 F.3d 118, 128 (2d Cir. 1998).  This test cannot be satisfied by Foreign Plaintiffs who are foreign investors who purchased shares of Rhodia, a foreign corporation, on a foreign exchange.  Cf. Froese v. Staff, 2003 WL 21523979, *2 (S.D.N.Y. Jul. 7, 2003) (finding that the "effects test" was not satisfied because "[t]he plaintiffs here are all foreign, [the defendant] is a German corporation, and the stock was sold on a German exchange").  Indeed, Lead Plaintiffs do not argue that the "effects test" warrants this Court's exercise of jurisdiction over Foreign Plaintiffs' claims.  (See Pls.' Mem. of Law at 7-16.) The "effects test" is only meant to shield domestic investors and domestic markets from the effects of securities frauds perpetrated elsewhere.  In re Parmalat Securities Litigation, 376 F. Supp. 2d 472, 511, 511 n.194 (S.D.N.Y. 2005).

The second test is the "conduct test", announced in Leasco
Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1336-37
(2d Cir. 1972) (cited in Itoba, 54 F.3d at 122).

> Under the conduct test, a federal court has
> subject matter jurisdiction if (1) the defendant's
> activities in the United States were more than
> "merely prepatory" to a securities fraud conducted
> elsewhere, Bersch v. Drexel Firestone, Inc., 519
> F.2d 974, 987 (2d Cir.), cert. denied, 423 U.S.
> 1018, 96 S. Ct. 453, 46 L. Ed. 2d 389 (1975), and
> (2) these activities or culpable failures to act
> within the United States "directly caused" the
> claimed losses, Alfadda [], 935 F.2d at 478.

Itoba, 54 F.3d at 122. "Inherent in the conduct test is the
principle that Congress does not want 'the United States to be
used as a base for manufacturing fraudulent security devices for
export, even when these are peddled only to foreigners.'" Itoba,
54 F.3d at 122, quoting Psimenos v. E.F. Hutton & Co., 722 F.2d
1041, 1045 (2d Cir. 1983).

Lead Plaintiffs allege that two categories of activities are
sufficient conduct under the "conduct test" to give rise to
subject matter jurisdiction in this Court; they are: the
assignment to Rhodia of environmental liabilities from the plant
site in Silver Bow, Montana and Rhodia's acquisition of ChiRex.
(Pls.' Mem. of Law at 9-16.)  These arguments are ultimately
without merit.

Plaintiffs allege that when Rhodia was spun off from Rhône-
Poulenc in 1998, many of Rhône-Poulenc's liabilities were also

spun-off into Rhodia; this included the liabilities held by the chemical plant in Silver Bow.  Plaintiffs allege that Rhodia failed to disclose to investors the extent of that liability. Plaintiffs also describe numerous United States regulatory actions undertaken against Rhodia as a result of the environmental contamination at Silver Bow.  Plaintiff's further argue that Defendant's overstatement of ChiRex financial projections is conduct within the meaning of the test.  They note that ChiRex, an American company that was a subsidiary of Rhodia, was during all relevant periods headquartered in the United States.  (Pl. Mem. of Law at 13.)  Plaintiffs argue that Rhodia's overstatement of ChiRex's projections, leading to its eventual writedown of goodwill, satisfies the test.

However, Plaintiffs confuse the nature of the inquiry.  Step one under the conduct test is to determine whether the acts were more than merely preparatory acts of a securities fraud conducted elsewhere.  At all times the Court is concerned with the alleged fraud, and whether fraudulent activities were committed in the United States.  In this case, the activities undertaken in the United States were the object of the misrepresentations allegedly made by Rhodia, but were not themselves securities fraud.  The failure to reveal Silver Bow's liabilities to investors and the failure to report ChiRex's true financial status, both took place

24

abroad.

For example, in Froese v. Staff, a German parent company concealed from foreign traders the practice by its American subsidiary of overstating revenues. Specifically, the American subsidiary publicly reported revenue "amounts for products that the company delivered to and endeavored to force their retail network to accept despite no demand, with perhaps secret assurances that the goods, if unsold, could be returned." 2003 WL 21523979, at *1. In concealing this practice of its American subsidiary, the German parent corporation was misrepresenting the subsidiary's financial results to German traders. Id. The Froese court held that "the fraud itself occurred, if at all, when the allegedly fraudulent statements were conceived, engineered, and published in Germany." Id. at *2.

Likewise, in In re National Australia Bank Securities Litigation, an American subsidiary of an Australian bank allegedly used unrealistic financial models to inflate artificially the value of its mortgaging service rights. 2006 WL 3844465, at *2 (S.D.N.Y. 2006). The Australian bank presented those allegedly fraudulent financial models to its shareholders on Australia's and other foreign exchanges, thereby causing the bank's shareholders to incur losses. Id. at *1, *2. National Australia Bank held that despite the fact that the subsidiary

25

which produced the artificially inflated financial statements was American, the situs of the fraud was elsewhere:

> [The subsidiary's] alleged fraudulent conduct – however it may be classified – is not in itself securities fraud. It amounts to, at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad . . . . [T]he domestic conduct would be immaterial . . . but-for (i) the allegedly knowing incorporation of [the subsidiary's] false information; (ii) in public filings and statements made abroad; (iii) to investors abroad; (iv) who detrimentally relied on the information in purchasing securities abroad.

Id. at *8.

Foreign Plaintiffs' claims here are similar to these cases where the alleged activities in the United States were merely the objects of fraudulent representations made abroad. The Complaint does not allege that Defendants generated any of the allegedly fraudulent statements and filings for foreign investors in this country. The fraudulent statements alleged in the Complaint were all created by Rhône-Poulenc or Rhodia – both foreign corporations – or by foreign employees who work there. While some of the allegedly fraudulent statements issued by Rhodia and Rhône-Poulenc trickled over to this country via the domestic press and investment banks, Lead Plaintiffs do not allege that those statements were "engineered" here.

And, even if those acts that took place in the United States could be considered securities fraud, they were merely a link in

26

the chain of the overall scheme, which was perpetrated abroad. Just as the Circuit found in Societe Nationale, "even the most generous interpretation of [Plaintiffs'] assertions concerning [U.S. contacts] merely establishes that acts in the United States helped make the gun whence the bullet was fired from places abroad." Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Intern. Ltd., 928 F.Supp. 398, 405 (S.D.N.Y. 1996) (quoting Bersch, 519 F.2d at 987). The entire alleged scheme, which involved Rhodia's assumption of liabilities and acquisition of allegedly failing corporations, was engineered by foreign corporations on foreign soil.

Step two under the "conduct test" is to determine whether Plaintiffs sufficiently allege that Defendant's misrepresentations directly caused the harm for which they seek redress. "American antifraud securities laws apply to the alleged foreign fraudulent scheme if there is a sufficient connection between substantial domestic activities of the transaction alleged to have violated the securities laws and the consequential financial losses the claimant asserts." In re Alstom SA, 406 F.Supp.2d 346, 380-381 (S.D.N.Y. 2005). Even if Plaintiffs were to satisfy step one of the inquiry, their arguments would fail here.

The Complaint alleges that "tens, if not hundreds" of plant-

site liabilities from around the world were transferred to
Rhodia, but the only environmental liability incurred by Rhodia
which pertained to a plant-site on American soil was in Silver
Bow, Montana.  Lead Plaintiffs' allegations do not even suggest
that the Silver Bow liabilities were a substantial portion of the
environmental liabilities incurred by Rhodia.  Instead, the
Complaint contends that Rhodia owed $20 million for Silver Bow,
but also alleges that Rhône-Poulenc's agreement to indemnify
Rhodia up to €122 million[6] for environmental liabilities
worldwide was nowhere near sufficient.  Nor does Defendants'
acquisition of ChiRex, which was a United States entity,
predominate over Defendants' alleged fraud.  Plaintiffs allege
that the acquisition of ChiRex was only part of a larger scheme
to inflate the price of Rhodia, that included, among other
things, the purchase of a British manufacturer of phosphates and
chemicals, Albright & Wilson PLC (A&W).  Plaintiffs do not argue
that the ChiRex acquisition was a "direct cause" of their losses.
As such, Defendants American activities were neither significant
in light of the global scope of their business, nor can they be

---

[6]  Plaintiffs submissions include conflicting
representations as to the amount of indemnification.  At one
point the Complaint alleges an indemnification of €122 million
(Complaint at ¶ 41) and elsewhere states that the indemnification
as €132 million (Complaint at ¶ 83).  However, the discrepancy is
irrelevant given that both numbers far exceed the total amount of
liability held by Silver Bow.

said to have been a direct cause of Foreign Plaintiffs' losses.

Finally, Plaintiffs argue that Rhodia filed false statements with the SEC, but in their submissions they do not assert those filings as a potential source of "conduct" for this Court to consider. However, in light of the Circuit's holding in Itoba, the law requires an analysis of this issue as well. In Itoba, American investors relied on a report that was itself based on a fraudulent SEC filing when they decided to purchase stock in a foreign corporation. In Itoba, the Circuit held that "SEC filings generally are the type of 'devices' that a reasonable investor would rely on in purchasing securities of the filing corporation. When these United States filings include substantial misrepresentations, they may be a predicate for subject matter jurisdiction." 54 F.3d at 123. Although Plaintiffs' allege fraudulent SEC filings in this case, the facts are distinguishable. (Complaint at ¶¶ 92, 98, 103, 110, 117, 130, passim).

Rhodia's filing of SEC reports were conceived, engineered, and published on foreign soil. Cf. In re Bayer AG Securities Litigation, 423 F. Supp. 2d 105, 111-12 (S.D.N.Y. 2005) (finding that it was appropriate to consider whether documents, including SEC filings, "emanated from a foreign source"), quoting SEC v. Berger, 322 F.3d 187, 195 (2d Cir. 2003).  More importantly,

29

Foreign Plaintiffs' in this case do not allege that they relied upon these United States filings when they purchased stock in a foreign corporation, or that those filings were a "direct cause" of the harm that they suffered.  Where, in Itoba, the SEC filings were relied upon by American investors in making their investment decisions, Foreign Plaintiffs make no similar showing here.  The SEC filings, alone, are insufficient to trigger this Court's subject matter jurisdiction over Foreign Plaintiffs.

Finally, returning to the ultimate question of Congressional intent:

> [I]nsofar as the Second Circuit's subject matter jurisdiction doctrine viewed as a whole suggests an overlying principle...it is one that, in the final analysis, is grounded on congressional policy as bounded by a standard of reasonableness. As expressed in Bersch, the ultimate question is whether Congress contemplated that American resources would be allocated to adjudicate predominantly foreign disputes and whether the United States has a relevant interest in the litigation.

In re Alstom SA, 406 F.Supp.2d at 375, citing 519 F.2d at 985, 993.  Congress could not have intended United States courts to mediate entirely foreign disputes involving foreign investors and their securities in foreign corporations traded on foreign markets.  Accordingly, Moving Defendants' Motion to Dismiss Foreign Plaintiffs' claims pursuant to Sections 10(b) and 20(a)

30

of the Exchange Act for lack of subject matter jurisdiction is hereby GRANTED. Jurisdiction over United States resident investors, and over Plaintiffs who purchased ADSs traded on American securities markets is retained.

B.    Personal Jurisdiction over Defendants Auffret and Clamadieu

The residual claims pertain to Remaining Plaintiffs, i.e., putative class members who either were shareholders of Rhodia's ADSs on the New York Stock Exchange during the Putative Class Period or were American traders who invested in ordinary shares of Rhodia on the Paris Bourse during the Putative Class Period.

Moving Defendants Auffret and Clamadieu have moved to dismiss the remaining claims against them for lack of personal jurisdiction. They argue that the Complaint sets forth no allegation that either of them engaged in minimum contacts with the United States to warrant their being haled into court here. Lead Plaintiffs, however, argue that the Complaint is sufficient because of its general allegation that Auffret and Clamadieu were Rhodia's COO and CEO respectively, and thus had sufficient minimum contacts with the United States simply by virtue of their leadership positions. The Court concludes that Lead Plaintiffs are incorrect.

31

On a motion to dismiss pursuant to Rule 12(b)(2), plaintiffs bear the burden of establishing the court's jurisdiction over the defendants.  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999); City of New York v. CycoNet, 383 F. Supp. 2d 526, 540 (S.D.N.Y. 2005).  However, if a forum's personal jurisdiction over a defendant is questioned before discovery has commenced, in order to defeat the motion, a plaintiff only has to establish that personal jurisdiction is proper based on information in the Complaint as well as supporting documentation.  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).  The court must assume all the factual allegations in the complaint are true, and resolve all doubts in plaintiff's favor "notwithstanding a controverting presentation by the moving party."  A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993).

In general, federal courts must guarantee that personal jurisdiction is in accordance with both the long-arm statute of the state in which the federal court is located and with the Constitution.  A federal court's exercise of personal jurisdiction over a defendant also must satisfy constitutional due process requirements.  Under the Constitution, a state has personal jurisdiction over a defendant with whom that state has:

certain  minimum  contacts  .  .  .  such  that  the

maintenance of the suit does not offend "traditional notions of fair play and substantial justice." In determining whether minimum contacts exist, the court considers the relationship among the defendant, the forum, and the litigation. To establish the minimum contacts necessary to satisfy "specific" jurisdiction, the plaintiff first must show that his claim arises out of or relates to defendant's contacts with the forum state. The plaintiff must also show that the defendant "purposefully availed" himself of the privilege of doing business in the forum state and that the defendant could foresee being "haled into court" there.

Chew v. Dietrich, 143 F. 3d 24, 28 (2d Cir. 1988). See also City of New York v. CycoNet, 383 F. Supp. 2d 526, 541 (S.D.N.Y. 2005).

That Defendants Auffret and Clamadieu – French citizens and residents – were Rhodia executives does not, without more, amount to sufficient minimum contacts with this forum. Defendants submit a Declaration by Jean-Pierre Labroue, Group Executive Vice President and General Counsel for Rhodia, which asserts that Auffret and Clamadieu were "wholly uninvolved" with the transactions at issue in the Complaint, played no role in Rhodia's acquisitions of A&W and ChiRex, made no allegedly false statements described in the Complaint, and finalized none of the publicly filed reports therein. While it is not Lead Plaintiffs' burden at this early stage of the litigation to furnish proof to counter these assertions, they are responsible for making good faith allegations which would establish a prima facie showing of

33

personal jurisdiction.  This Lead Plaintiffs have not done.

Being a corporation's control person of itself does not, as Lead Plaintiffs contend, merit personal jurisdiction, see Parmalat, 376 F. Supp. 2d at 454, nor does being a corporation's board member, see In re Alstom SA, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005).  Lead Plaintiffs have not set forth any specific allegation that Auffret or Clamadieu issued any statements, effectuated any transactions, or authorized any acquisitions that constitute the misconduct alleged in the Complaint.  Lead Plaintiffs' reliance on their conclusory allegation that Auffret and Clamadieu were control persons of Rhodia is not sufficient, especially in light of Labroue's Declaration.

Accordingly, Defendants Auffret and Clamadieu's Motion to Dismiss for lack of personal jurisdiction is hereby GRANTED.

## C.   Failure to State a Claim

### (1)   Rule 12(b)(6) Legal Standard

In deciding whether to dismiss a cause of action for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must read the complaint generously, accepting as true all factual allegations therein and drawing all reasonable inferences in favor of the plaintiff.  Bolt Elec.,

34

Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995); Mills
v. Polar Molecule Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).
Dismissal is only proper when it "appears beyond doubt that
plaintiff can prove no set of facts in support of his claim which
would entitle him to relief." Chance v. Armstrong, 143 F.3d 698,
701 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46
(1957)).

Because a Rule 12(b)(6) motion is used to assess the legal
feasibility of a complaint, a court should not "assay the weight
of the evidence which might be offered in support thereof."
Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). Rather,
consideration of a Rule 12(b)(6) motion is limited to the factual
allegations in the complaint, documents attached to the complaint
as exhibits or incorporated in it by reference, to matters of
which judicial notice may be taken, or to documents either in
plaintiff's possession or of which plaintiff had knowledge and
relied on in bringing suit. Brass v. American Film Technologies,
Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citing Cortec Indus.,
Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).


(2)   Section 10(b) Claim

To state a cause of action for securities fraud under
Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §

78j(b)) and Rule 10b-5 promulgated pursuant to it (17 C.F.R. §
240.10b-5(b)), "'a plaintiff must plead that in connection with
the purchase or sale of securities, the defendant, acting with
scienter, made a false material representation or omitted to
disclose material information and that the plaintiff's reliance
on defendant's action caused [plaintiff] injury."' Rothman v.
Gregor, 220 F.3d 81, 89 (2d Cir. 2000) (quoting Chill v. General
Electric Co., 101 F.3d 263, 266 (2d Cir. 1996)).[7]

"The scope of Rule 10b-5 is coextensive with the coverage of
§ 10(b)." See SEC v. Zandford, 122 S. Ct. 1899, 1901 n.1 (2002).
Securities fraud claims must be pled with sufficient specificity

_____

[7] Rule 10b-5 provides in full:

§ 240.10b5 Employment of manipulative and deceptive
devices.

It shall be unlawful for any person, directly or
indirectly, by the use of any means or
instrumentality of interstate commerce, or of the
mails or of any facility of any national securities
exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact
or to omit to state a material fact necessary in
order to make the statements made, in the light of
the circumstances under which they were made, not
misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud
or deceit upon any person, in connection with the
purchase or sale of any security.

under Rule 9(b) of the Federal Rules of Civil Procedure: "'The
primary purpose of Rule 9(b) is to afford defendant fair notice
of the plaintiff's claim and the factual ground upon which it is
based."' Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)
(quoting Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990). Rule
9(b) requires a party averring fraud or mistake to state with
particularity "the circumstances constituting [the] fraud or
mistake." Fed. R. Civ. P. 9(b).

The "particularity requirement" contained in Rule 9(b) is
substantial: "'[A] complaint must adequately specify the
statements it claims were false or misleading, give particulars
as to the respect in which plaintiff contends the statements were
fraudulent, state when and where the statements were made, and
identify those responsible for the statements."' Kelly v. L.L.
Cool J., 145 F.R.D. 32, 38 (S.D.N.Y. 1992) (quoting Cosmas v.
Hassett, 886 F.2d 8, 11 (2d Cir. 1989)); see also DiVittorio v.
Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.
1987) (same); Keenan v. D.H. Blair & Co., 838 F. Supp. 82, 86
(S.D.N.Y. 1993) (same); Kubin v. Miller, 801 F. Supp. 1101, 1117
(S.D.N.Y. 1992) (same). However, the Supreme Court has left open
the question of whether Rule 9(b)'s heightened pleading
requirement applies to allegations of loss causation. See Hunt
v. Enzo Biochem, 471 F. Supp. 2d 390, 409 (S.D.N.Y. 2006)

(applying Rule 8(a)'s notice standard when reviewing a plaintiff's loss causation allegations), citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345 (2005).

Moving Defendants do not challenge all of the elements of Lead Plaintiffs' Section 10(b) claim.  They do not challenge whether the Complaint alleges the sale and purchase of securities; they do not challenge whether the Complaint alleges material misrepresentations or omissions; and they do not challenge whether the Complaint alleges Lead Plaintiffs' reliance on those misrepresentations or omissions.  Moving Defendants, however, do challenge Lead Plaintiffs' allegations of loss causation and scienter.[8]

### (a)   Loss Causation

To prove loss causation, plaintiffs must prove that any losses they incurred resulted from the defendants' fraud.  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir.

---

[8] Because the Court, infra, dismisses the remaining claims in the Complaint for reasons argued by Moving Defendants (i.e., for failure to plead adequately loss causation and scienter), the Court need not address whether the Complaint satisfies the other three elements of Section 10(b).

2007), quoting Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005).  Establishing loss causation is critical because Section 10(b) is not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345 (2005).

Under Section 10(b)'s loss causation requirement, "'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  Lentell, 396 F.3d at 173, quoting Suez Equity Investors L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis supplied).  "Loss causation . . . is concerned less with the misrepresentation which fooled the victim into the transaction, and more with whether it was the concealed or misrepresented fact which caused the harm."  Leykin v. AT&T Corporation, 423 F. Supp. 2d 229, 239 (S.D.N.Y. 2006).  In other words, it is the materialization of the concealed risk that must cause a plaintiff's loss.  Lentell, 396 F.3d at 173.

While it is not necessary for shareholders to allege that the public disclosure of a concealed truth was the cause of their loss, courts in this District generally have found that a public disclosure, when alleged properly, is the incident which

39

satisfies the loss causation requirement.  For example, in City
of Sterling Heights Police and Fire Retirement System v. Abbey
National PLC, the defendant was a financial services corporation
involved in international asset backed investments, wholesale
lending, and asset financing.  423 F. Supp. 2d 348, 353 (S.D.N.Y.
2006).  Despite the defendants' having purchased bonds of Enron,
Tyco and WorldCom - investments which defendants allegedly knew
were doomed to fail - the defendants had consistently reported to
the investing public that their financial health was "in good
shape" and that there were "no gaping holes" in their
investments.  Id. at 353.  Defendants later "shocked the market"
by announcing that their profits were "substantially lower than
expected", attributing those losses to various "corporate
exposures" including Tyco's collapse.  Id.  Within five days of
defendants' announcement, the value of each of the plaintiffs'
shares had dropped from $29.40 to $23.80.  Id.  The Sterling
Heights court found that the materialization of the concealed
risk was the public announcement of the corporation's failures.
Id. at 362.  In other words, the plaintiffs adequately pleaded
loss causation because they alleged that the value of their
securities dropped immediately following defendants'
announcement.  The "share price fell significantly after the
truth became known."  Id., quoting Dura, 544 U.S. at 346.

Other courts in this District have further refined the public disclosure analysis, concluding that the loss causation requirement is satisfied only if the public disclosure causing injury addressed the specific fact allegedly concealed. Disclosure of financial losses generally – even if those financial losses are a result of the specific concealed fact – is not sufficient.  For example, in In re eSpeed, Inc. Securities Litigation, the plaintiff shareholders alleged that the defendant corporation fraudulently concealed information about its use of software which was "detested by its customers" and bound to produce "artificial short-term gains".  457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006).  The shareholders further alleged that the corporation's stock dropped precipitously immediately following its announcement that its "business was not progressing as previously anticipated".  Id.  The court dismissed the shareholders' complaint because the announcement causing injury revealed nothing about the specific fact allegedly concealed from investors, i.e., that the corporation was beholden to a software system bound to produce artificial short-term gains.  Id.  In so reasoning, the eSpeed court compared the facts of that case to the Supreme Court's decision in Dura:

> In Dura, defendant allegedly made two distinct
> false    statements:    (1)    defendant    falsely
> represented the extent of its profits from drug
> sales; and (2) it also claimed that it expected

the [FDA] to approve its new spray device to treat asthma.  On the last day of the putative class period, defendant announced disappointing earnings, which it specifically attributed to low drug sales.  The next day, defendant's shares plummeted.  Eight months after that loss, defendant announced that the FDA would not approve defendant's spray device after all.

Because there was no corrective disclosure regarding the spray device before the economic loss occurred, the alleged deception regarding the spray device could not possibly have caused the economic loss.

eSpeed, 457 F. Supp. 2d at 295 (emphasis in original), citing Dura 544 U.S. at 339-40, 346.

In the instant case, the Complaint seeks recovery for the losses Plaintiffs incurred over the entire thirty-five month period that the value of Rhodia's securities declined.  However, at no time prior to the March 23, 2004 public disclosure of the criminal investigation did Defendants disclose the precise facts allegedly concealed.  Before March 23, 2004, they did not reveal A&W and ChiRex' mis-reported worth, nor did they reveal the environmental and pension liabilities transferred to Rhodia.  As in eSpeed and Dura, it could not have been the disclosure of these alleged facts which caused the value of Rhodia's securities to drop.  Rather, it was the fact that Rhodia's earnings were disappointing - earnings which Rhodia routinely reported to the public - that allegedly caused the slow depreciation.  For these

42

reasons, only the alleged losses immediately following the March 23, 2004 announcement are actionable pursuant to the "public disclosure" test.

In order for Remaining Plaintiffs to recover for any decline in stock price prior to March 23, 2004, the Complaint must allege that the risk created by Rhodia's purportedly unwise financial investments materialized in some way other than by a public disclosure, and that such materialization caused the loss to the Remaining Plaintiffs.  Where courts have held that materializations of risks other than public disclosures resulted in shareholders' losses, those materializations were sudden and caused the stock value to plummet.  In In re Parmalat Securities Litigation, for example, Parmalat had engineered a massive scheme to overstate its net assets and understate its debt.  375 F. Supp. 2d 278, 284 (S.D.N.Y. 2005).  When the scheme became unsustainable, Parmalat suffered a liquidity crisis and announced that it would not be able to pay maturing bonds as they came due. Id.  As a result of that announcement, the prices of Parmalat's stock "dropped sharply".  Id. at 307.  Eight days later, Parmalat announced the reason for its liquidity crisis, explaining to the investing public that "a Bank of America account allegedly held by [Parmalat's shell company] that supposedly contained $4.9 billion did not exist."  Id. at 284.  The court held that the

43

risk created by Parmalat's fraudulent conduct materialized not
when the truth of Parmalat's scheme had been disclosed, but when
Parmalat announced eight days earlier that it would not be able
to pay maturing bonds as they came due.

Parmalat is distinguishable from the instant case.  Lead
Plaintiffs allege a slow, steady decline in Rhodia's securities,
not a "sharp drop" resulting from the announcement of a massive
liquidity crisis.  Moreover, the plaintiffs in Parmalat were able
to isolate a particular incident – i.e., the announcement that
Parmalat would not be able to pay maturing bonds – which caused
the drop in their shares' values.  The Complaint in this case
pinpoints no such incident other than the March 23, 2004
disclosure.  The Complaint's generalized allegations that ChiRex
and A&W were imprudent acquisitions, that Rhône-Poulenc
transferred undisclosed liabilities to Rhodia, and that Rhodia's
reported data used improper accounting practices, do not
automatically mean that those acquisitions, liabilities, and
improper practices actually caused the trading price of Rhodia's
stock to fall.  The Complaint essentially is stating that had the
financial outlook of Rhodia been as represented, its earnings
would not have continuously decreased.  This is not enough to
infer that the alleged fraud also caused the decrease in stock
prices.  Cf. Leykin, 423 F. Supp. 2d at 246 (S.D.N.Y. 2006) ("The

only allegation of a causal link between the alleged

misrepresentations and the liquidity crisis is: 'If the true

subscriber growth and prospects had been as represented, At Home

would have had more financial strength and would not have had to

file for bankruptcy as it did' . . . . Such an assertion is too

general and conclusory to support an inference that defendants'

fraud proximately caused the decline in stock prices.").

The allegations in the Complaint describe a slow, steady

decline which, importantly, Defendants never actually hid from

the public.  All Defendants allegedly did do was lie about the

reasons for the disappointing earnings.  Where there are warnings

about the steady decline of a publicly owned company, its

shareholders cannot innocently claim ignorance about the true

status of the company's financial health.  In re Initial Public

Offering Securities Litigation, 399 F. Supp. 2d 298, 309

(S.D.N.Y. 2005), quoting Lentell, 396 F.3d at 177 ("'[W]here

substantial indicia of the risk that materialized are

unambiguously apparent on the face of the disclosures alleged to

conceal the very same risk', [there is] a heavy burden on

plaintiffs to plead their losses specifically.")  See also

Lattanzio, 476 F.3d at 157-58 ("Even taking Warnaco's misstated

financial statements at face value, it cannot be said that the

risk of bankruptcy was altogether concealed.  In May 2000,

45

Warnaco reported a TSE of $563 million; twelve months later that number had dropped to $35 million - a 94% loss in one year. Clearly, Warnaco could not continue for very long in this direction.").

To the extent that the Complaint alleges that Defendants' improper accounting practices concealed the true value of Rhodia's assets, thereby inflating the purchase price of its securities (see, e.g., Compl. ¶¶ 126-27, 141, 154-56, 169), those allegations also are insufficient. Allegations of an inflated purchase price and nothing more do not satisfy loss causation pleading requirements. As the Supreme Court recently explained:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or

46

> all of that lower price . . . . Other things being
> equal, the longer the time between purchase and
> sale, the more likely that this is so, i.e., the
> more likely that other factors caused the loss.

Dura, 544 U.S. at 342-43.  Put differently, "[i]t is not enough

to allege that a defendant's misrepresentations and omissions

induced a 'purchase-time value disparity' between the price paid

for a security and its 'true investment quality'".  Lentell, 396

F.3d at 174.  Therefore, the Complaint's allegations that

Defendants' inflated the value of the stock do not, by

themselves, satisfy the loss causation requirement.

The only other alleged misrepresentations pertain to

Defendants' persistent optimism about the disappointing numbers

they were reporting.  However, "Where the alleged misstatement is

an intentionally false opinion, the market will not respond to

the truth until the falsity is revealed – i.e. a public

disclosure."   In re Espeed, Inc. Securities Litigation, 457 F.

Supp. 2d 266, 283 (S.D.N.Y. 2006), citing In re Initial Public

Offering Securities Litigation, 399 F. Supp. 2d 298, 307

(S.D.N.Y. 2005) and In re WorldCom, Inc. Securities Litigation,

2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005).  At no time prior

to March 23, 2004 did Defendants reveal that their opinion about

Rhodia's outlook was false, and therefore those opinions cannot

have caused Lead Plaintiffs' loss.

47

As a final note on this issue, that the Complaint alleges that the value of Rhodia's publicly traded shares declined prior to the Putative Class Period for reasons "unrelated" to the misconduct alleged also is detrimental to the Section 10(b) claim. That allegation strongly suggests that market forces other than the alleged misconduct at least contributed to, if not entirely caused, the fall in Rhodia's stock prices during the Putative Class Period. Cf. Lentell, 396 F.3d at 174, quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("'[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'") (alterations in original).

Accordingly, the Complaint's remaining 10(b) claims are dismissed to the extent that they seek recovery for losses that did not result from the March 23, 2004 disclosure of the criminal investigation of Rhodia.

(b)   Scienter

Moving Defendants also argue that the Complaint has not sufficiently alleged scienter.  The scienter element requires that a plaintiff allege facts indicating that a defendant has a mental state embracing "intent to deceive, manipulate or defraud."  Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).  A plaintiff may allege scienter in one of two ways: (1) by pleading "motive and opportunity to commit fraud", or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotations and citations omitted).

(i)   Motive and Opportunity

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994).  Because the remaining individual defendants - Tirouflet and Prot - were corporate officers of Rhodia, they had an opportunity to commit fraudulent acts.  See

49

Kalnit, 264 F.3d at 139 (finding that it may be presumed that
corporate officers have the opportunity to commit fraudulent
acts).  What is disputed, however, is whether the Complaint
sufficiently alleges motive.

A general wish by corporate officers to preserve their
executive positions or to increase their compensation is not
sufficiently concrete to allege motive, Kalnit, 264 F.3d at 139;
Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995), nor
is the desire to inflate stock prices or the desire to maintain a
false veneer of corporate profitability, Kalnit, 264 F.3d at 139.
The Second Circuit has held, however, that motive is shown where
the insider officer is alleged to have traded her own shares
while misrepresenting corporate performance to the investing
public.  Id.  According to the Second Circuit, the desire to
"consummate a corporate transaction" alone does not satisfy a
plaintiff's motive pleading obligations.  Rothman v. Gregor, 220
F.3d 81, 93-94 (2d Cir. 2000).

The Complaint does not sufficiently allege motive.  The
motive allegations state only that some of the Individual
Defendants sought to avoid being ousted from their positions
(Compl. ¶ 221), that "Tirouflet, Prot, and other senior officers
and directors of Rhodia . . . supported [Rhodia's] illegal
actions to receive millions of dollars in unearned compensation

from performance-based salary and bonuses" (Compl. ¶ 221), and that some of the Individual Defendants sought to conceal the fact that the Heads of Agreement was not negotiated at "arm's length" (Compl. ¶ 221).  These allegations are precisely the kinds of allegations which the Second Circuit has concluded are not sufficient.  See, e.g., Kalnit, 264 F.3d at 142, explained supra. The Complaint has "not pointed to any specific benefit that would inure to the defendants that would not be . . . generalized to all corporate directors".  Individual Defendants' alleged motives to earn undeserved compensation and to avoid ouster are motives held "not just by the defendant directors specifically".  Kalnit, 264 F.3d at 142.

Accordingly, this Court holds that the Complaint's motive allegations are not sufficient.


(ii) Conscious Misbehavior or Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987), quoted in Kalnit, 264 F.3d at 142.  A plaintiff may show conscious misbehavior or recklessness by alleging facts that show

a defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rothman, 220 F.3d at 90 (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)).

The pleading requirements for conscious misbehavior or recklessness generally impose on plaintiffs the burden of alleging that defendants had knowledge of specific facts or documents that they disregarded. Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). "Such lack of specificity ordinarily is fatal to a plaintiff's effort to plead scienter based on conscious misbehavior or recklessness." eSpeed, 457 F. Supp. 2d at 292.

The Complaint alleges that Tirouflet "negotiated and approved" the Heads of Agreement (Compl. ¶ 55), as well as the first amendment to the Heads of Agreement, which shifted the risk of loss in the Rhodia Call Option from Rhodia to Donau (Compl. ¶ 66). Notably, however, the Complaint does not allege that Tirouflet was involved in the negotiation of the second amendment to the Heads of Agreement, which was the instrument that purportedly re-allocated the Rhodia Call Option's risk of loss back to Rhodia. (See Compl. ¶ 67.) Therefore, Tirouflet cannot

52

be presumed to have had knowledge about the very amendment which allegedly obliged Rhodia to purchase the undercapitalized A&W. Further, the Complaint does not allege specifically that Tirouflet negotiated, or was even aware of, any other document which was to Rhodia shareholders' detriment.  Because officers cannot be imputed with knowledge about all transactions which occur at a corporation for purposes of pleading scienter, see, In re Sotheby's Holdings, Inc., 2000 WL 1234601, at *7 (S.D.N.Y., Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter"), and because Tirouflet is not alleged to have had specific knowledge about any instruments allegedly concealed from investors, the Court finds that the Complaint does not sufficiently allege that Tirouflet acted recklessly with regard to any specific information he knew.

Nor does the Complaint contain any specific allegations as to Defendant Prot.  Plaintiffs rely on the general allegations in the Complaint that "Defendants" were aware of the financially detrimental investments made by Rhodia.  These kinds of allegations are not sufficient under the Kalnit standard.

Accordingly, Moving Defendants' Motion to Dismiss the

53

remaining components of Remaining Plaintiffs' Section 10(b) claim
is hereby GRANTED.

### (3)   20(a) Claim

Section 20(a) of the Securities Exchange Act provides:

> Every person who, directly or indirectly, controls
> any person liable under any provision of this
> chapter or of any rule or regulation thereunder
> shall also be liable jointly and severally with
> and to the same extent as such controlled person
> to any person to whom such controlled person is
> liable, unless the controlling person acted in
> good faith and did not directly or indirectly
> induce the act or acts constituting the violation
> or cause of action.

15 U.S.C. § 78t(a).   In order to establish a prima facie case of
liability under § 20(a), a plaintiff must show: (1) a primary
violation by a controlled person; (2) control of the primary
violator by the defendant; and (3) "that the controlling person
was in some meaningful sense a culpable participant" in the
primary violation.   Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d
Cir. 1998) (quoting First Jersey, 101 F.3d at 1472); see also
Suez Equity Investors, 250 F.3d at 101 (stating that
"[c]ontrolling-person liability is a form of secondary liability,
under which a plaintiff may allege a primary § 10(b) violation by
a person controlled by the defendant and culpable participation
by the defendant in the perpetration of the fraud").

There must be predicate 10(b) liability before a person can be held liable under Section 20(a).  Because the Court has dismissed, <u>supra</u>, the Section 10(b) claim, Moving Defendants' Motion to Dismiss the Section 20(a) claim also is hereby GRANTED.


D.   <u>Leave To Amend</u>

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  "While it is the usual practice upon granting a motion to dismiss to allow leave to replead," <u>Cohen v. Citibank</u>, No. 95 Civ 4826, 1997 WL 883789, at *2 (S.D.N.Y. Feb. 28, 1997), a court may dismiss without leave to amend when amendment would be futile.  <u>Oneida Indian Nation of New York v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (citing <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962)).

Granting Lead Plaintiffs leave to amend their Complaint as it pertains to Foreign Plaintiffs' Section 10(b) and Section 20(a) claims would be futile.  Foreign investors who traded Rhodia securities on the Paris Bourse do not meet the territoriality requirements of the Exchange Act.  It is clear to the Court that Lead Plaintiffs' allegations about the location of any relevant conduct are complete, and that therefore there are

no further allegations which could remedy the Complaint's subject matter jurisdiction infirmities.  The Court also finds that there are no further allegations about the whereabouts of Defendants Auffret and Clamadieu's actions which could subject them to personal jurisdiction in this District.  The Labroue Declaration gave Lead Plaintiffs notice of Auffret and Clamadieu's conduct, but Lead Plaintiffs did not even respond with good faith allegations to the contrary.  Accordingly, Lead Plaintiffs shall not be granted leave to amend the Complaint as to subject matter jurisdiction or personal jurisdiction.

However, Lead Plaintiffs shall be granted leave to amend their Complaint to allege facts sufficient to isolate any particular incidents prior to the March 23, 2004 disclosure which precipitated any specific decreases in value to Remaining Plaintiffs' shares.  Because the Complaint alleges that the price of Remaining Plaintiffs' shares dropped over the course of the Putative Class Period, it would not be futile to grant Lead Plaintiffs leave to amend the Complaint to apportion particular drops in the shares' values to particular materialized risks. Cf. IPO Securities Litigation, 399 F. Supp. 2d at 309 (granting plaintiffs leave to amend claim for securities fraud to plead "facts sufficient to apportion the losses between the disclosed and undisclosed portions of the risk that ultimately destroyed an

investment"); Catton v. Defense Technology Systems, Inc., 2006 WL
27420, at *10 (S.D.N.Y. Jan. 3, 2006) ("To establish [loss
causation], plaintiffs could mention the price of the Company's
stock on specific dates, indicating that the stock price went up
after misstatements and went down after disclosures.").

As well, Lead Plaintiffs shall be granted leave to amend
Remaining Plaintiffs' claims to allege scienter. Because the
Complaint alleges that Defendant Tirouflet was Chairman and CEO
for the majority of the Putative Class Period, and because the
Complaint alleges that Defendant Prot was Chief Financial Officer
and Senior Vice President of Rhodia throughout the Putative Class
Period (Compl. ¶ 24), it would not be futile to permit Lead
Plaintiffs to allege that Tirouflet and Prot, as high-ranking
Rhodia officers, were aware of particular facts or documents
which they recklessly disregarded.


### III. CONCLUSION

For the reasons contained herein, Moving Defendants' Motion
to Dismiss the Complaint is GRANTED as to the Foreign Plaintiffs
and as to individual Defendants Auffret and Clamadieu. Lead
Plaintiffs are granted leave to amend the Section 10(b) and
Section 20(a) claims by Remaining Plaintiffs within 45 days of
the date of this Order in accordance with the conclusions stated

above.

Furthermore, because Defendant Sanofi-Aventis, S.A. neither answered the Complaint nor joined in Moving Defendants' Motion to Dismiss, and because Lead Plaintiffs have not served Defendant Sanofi-Aventis, S.A. with the Complaint, Lead Plaintiffs shall show cause within 45 days of the date of this Memorandum & Order why Remaining Plaintiffs' remaining claims against Defendant Sanofi-Aventis, S.A. should not be dismissed for failure to prosecute. See Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42 (2d Cir. 1982) (holding that a district court's authority to dismiss an action for failure to prosecute "cannot seriously be doubted"). Should Lead Plaintiffs fail within 45 days of the date of this Memorandum & Order to show cause, Lead Plaintiffs shall have their claims against Defendant Sanoft-Aventis, S.A. dismissed in their entirety for failure to prosecute. Lead Plaintiffs' showing of good cause, if any, shall be made by affidavit.

SO ORDERED.

DATED:    New York, New York

*September 24, 2007*

*Deborah A. Batts*

Deborah A. Batts
United States District Judge

58